UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ACADIA INSURANCE CO.,
    Plaintiff,

    v.                                   CIVIL ACTION NO.
                                         07-12282-MBB

JOSEPH CUNNINGHAM,
    Defendant.

**MEMORANDUM AND ORDER RE:
ACADIA INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT
(DOCKET ENTRY # 19)**

**January 10, 2011**

**BOWLER, U.S.M.J.**

In December 2007, plaintiff Acadia Insurance Company
("Acadia"), a Maine insurance company licensed to issue marine
insurance policies in Massachusetts, filed a complaint seeking a
declaratory judgment that it had no obligation to provide
coverage for water damage sustained by the Perseverance II ("the
vessel") during storage under an insurance policy issued to
defendant Joseph Cunningham ("Cunningham"), the vessel's owner.
Cunningham, a Massachusetts resident, filed an answer and a two
count counterclaim setting out claims for breach of contract and
declaratory relief.

Pending before this court is a motion for summary judgment
filed by Acadia (Docket Entry # 19) which Cunningham opposes
(Docket Entry # 21). After conducting a hearing, this court took

the motion (Docket Entry # 19) under advisement.

## SCOPE OF SUMMARY JUDGMENT RECORD

In addition to moving for summary judgment, Acadia moves to strike an affidavit filed by Richard Arthur Collins ("Collins"), an individual Cunningham retained to investigate the damage to the vessel. (Docket Entry # 25). Acadia submits that Cunningham did not disclose Collins' identity or file an expert report in accordance with Rule 26(a)(2)(B), Fed. R. Civ. P. ("Rule 26(a)"). The deadline for "expert discovery" was November 30, 2007. (Docket Entry # 9). Cunningham fails to address the nondisclosures.

In the affidavit, Collins opines that a "disconnect between [a] hose and its nipple was the sole reason that water entered and damaged the vessel." (Docket Entry # 23). He also attests that the vessel's bilge "plug would never extract the *sudden* burst of water that poured into Mr. Cunningham's vessel when the 2 inch diameter hose disconnected from its nipple." (Docket Entry # 23, ¶ 4) (emphasis added).

Collins arrived at these opinions by performing an experiment on the vessel after the discovery of the water damage and the denial of coverage. Specifically, he hosed the upper deck with water and observed water pour into the bilge area rather than off the vessel. Walking the lower deck, he noticed

and removed a deck plate and saw a hose inside disconnected from its nipple and water pouring from the hose into the bilge area.

Cunningham acknowledges that he "retained the professional services of" Collins, a marine consultant and owner of Race Marine Consultants. Collins likewise attests that Cunningham "hired" or "retained" him to investigate the damage and determine "how the water entered" the vessel. (Docket Entry # 23). Accordingly, there is no dispute that Collins is a witness "retained or specially employed to provide expert testimony." Rule 26(a)(2), Fed. R. Civ. P.

Rule 26(a)(2) mandates that such a witness, "[u]nless otherwise stipulated or ordered by the court," must prepare a written report. Rule 26(a)(2) also requires the disclosure of the identity of a testifying expert witness. The time to disclose the expert report and the expert's identity is the time set by the court, November 30, 2008. See Rule 26(a)(2)(C), Fed. R. Civ. P.

Rule 37(c)(1), Fed. R. Civ. P. ("Rule 37(c)(1)"), provides a self executing sanction which enforces the disclosures required under Rule 26(a)(2). See Poulis-Minott v. Smith, 388 F.3d 354, 358 (1st Cir. 2004) ("Rule 37(c)(1) enforces Rule 26(a)" and "can be applied to summary judgment motions"); Ortiz-Lopez v. Sociedad Espanola De Auxilio Mutuo, 248 F.3d 29, 33 (1st Cir. 2001) (Rule 37(c)(1) sanction "is a 'self-executing sanction for failure to

make a disclosure required by Rule 26(a)'"). The rule states that:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified *or* is harmless.

Rule 37(c)(1), Fed. R. Civ. P. (emphasis added). As recently noted by the First Circuit, "[T]he procedural rule itself makes clear [that] in the absence of harm to a party, a district court may not invoke the severe exclusionary penalty provided for by Rule 37(c)(1)." Cruz-Vazquez v. Mennonite General Hosp., Inc., 613 F.3d 54, 58 n.1 (1st Cir. 2010); Rule 37(c)(1), Fed. R. Civ. P., Advisory Committee Notes to 2000 Amendment ("[e]ven if the failure was not substantially justified, a party should be allowed to use the material that was not disclosed if the lack of earlier notice was harmless").

Preclusion is nevertheless "'not a strictly mechanical exercise.'" Esposito v. Home Depot U.S.A., Inc., 590 F.3d 72, 77 (1st Cir. 2009). The somewhat similar circumstances in Esposito, which necessitated a reversal of the district court's preclusion order provide guidance. Here, as in Esposito, Cunningham's need for Collins' testimony is great. Without it, there is no evidence that the water damage was "sudden" within the meaning of the policy. Cunningham bears the underlying burden of showing that the accident falls within the scope of coverage. See New

Fed Mortg. Corp. v. National Union Fire Ins. Co. of Pittsburgh, PA, 543 F.3d 7, 11 (1st Cir. 2008). Consequently, summary judgment in Acadia's favor more than likely results absent the inclusion of the affidavit in the summery judgment record. See Id. at 78 (recognizing that the "need for the expert was so great" that the decision to preclude the expert effectively amounted to dismissal of case); see also Cruz-Vazquez v. Mennonite General Hosp., Inc., 613 F.3d 54, 58 n.1 (severe exclusionary penalty not appropriate "in the absence of harm" and noting "[t]his is especially so" when exclusion results in dismissal).

Here again as in Esposito, Cunningham provides no reason for the late disclosure. See Id. (Esposito "never offered a legitimate reason for his late disclosure"). Moreover, like Esposito, although Acadia does not identify the prejudice, it filed a summary judgment motion after the November 30, 2008 deadline presumably recognizing that the failure to disclose Collins as a testifying expert significantly strengthened the summary judgment presentation. See Id. ("although the defendants here do not discuss in any great detail how the late disclosure prejudiced them, they obviously went through the pains of preparing a dispositive summary judgment motion premised on Esposito's lack of an expert in an expert-dependent case"). Even when coupled with a damaging effect on the district court's

docket, a circumstance not present in the case at bar, the Esposito court overturned the decision to preclude the expert. See Id. at 79 (failure to disclose expert "had a clear effect on the district court's docket" requiring court to push back pretrial and trial dates).

On the other hand, unlike the case at bar, Esposito sent the defendants the expert's curriculum vitae prior to the deadline. See Id. at 74. He also filed an engineering report in opposing summary judgment although the court relegated this fact to a footnote. See Id. at 75 n.1. Esposito additionally sought an extension of time albeit after the expiration of the twice extended deadline. See Id. at 74 & 79. The court concluded that missing the single deadline without "foot-dragging" yet with the serious effect of depriving "a potentially innocent victim of a defective product his day in court" required reversal of the preclusion order. See Id. at 79-81 (comma omitted).

Weighing and balancing all of the relevant concerns in this case, this court reaches the same conclusion that preclusion is not in order. First, it is true that the failure to disclose Collins as a testifying expert and provide an expert report by the deadline is not substantially justified. Cunningham offers no justification for the untimely disclosures much less a substantial one. Collins performed the experiment on August 13, 2007, yet Cunningham let the deadline pass without identifying

6

Collins as an expert witness or providing a report. Although this court finds the failure did not result from "unsavory scheming," the outright disobedience of the November 30, 2008 deadline, in place since April 2008, is not substantially justified. See Gagnon v. Teledyne Princeton, Inc., 437 F.3d 188, 197 (1st Cir. 2006) (contrasting "a tale of lack of effort, of bland disobedience of a series of court orders, or of unsavory scheming" to counsel's "miscalculated strategy" and "inexcusable failure to observe a long-established deadline" yet affirming finding of no substantial justification).[1]

Moreover, the failure was harmless. The harmless inquiry involves balancing "fairness, burden, and case management needs." Gagnon v. Teledyne Princeton, Inc., 437 F.3d 188, 198 (1st Cir. 2006). The counterclaim informed Acadia of the disconnected hose as the cause of the water pouring into the bilge area. (Docket Entry # 4, ¶ 12). Acadia listed Collins as an individual likely to have discoverable information in an automatic disclosure in May 2008. (Docket Entry # 13). Acadia knew of the possibility of Collins providing an expert opinion on or before Cunningham's July 17, 2008 deposition.[2] (Docket Entry # 19, Ex. 1, p. 115).

---

[1] The court in Gagnon remanded the case to explicitly focus on the unexplained and inadequately developed harmlessness inquiry. See Id. at 197-199.

[2] The deposition contains the following exchange:

7

Collins' affidavit and the opinions he renders are no surprise. Furthermore, although the Advisory Committee notes to the 1993 amendments "suggest a fairly limited concept of harmlessness," the present circumstances fall squarely within the reach of at least one of the illustrative examples, to wit, "a potential witness known to all parties." Gagnon v. Teledyne Princeton, Inc., 437 F.3d at 197 (illustrative examples include "late disclosures of a potential witness known to all parties" and "a trial witness already listed by the adverse party").

This court can reopen expert discovery to allow a late deposition once Collins produces a report. See generally Poulis-Minott v. Smith, 388 F.3d at 358 (Rules 26(a) and 37(c)(1) prevent unfair tactical advantage gained by nondisclosure which deprives other party of "opportunity to 'depose the proposed expert, challenge his credentials, solicit expert opinions of his own, or conduct expert-related discovery'"). To further avoid any unfairness, this court orders Cunningham to pay Acadia's attorneys' fees to review the report (once produced) and to

_____

Q. And, in fact, from what you've told me that's what Mr. Collins believes happened, water landing on the upper deck flows down through that stanchion and instead of being discharged from the vessel because the hose wasn't connected it went down into the bilge, right?

A. Exactly.

(Docket Entry # 19, Ex. 1, p. 115).

depose Collins.  Here, as in <u>Esposito</u>, some type of sanction is undeniably warranted.[3]  <u>See</u> <u>Esposito v. Home Depot U.S.A., Inc.</u>, 590 F.3d at 78 (noting that "Esposito failed to comply with a court-imposed deadline that he himself had suggested" without offering legitimate justification while stating that "district court was undoubtedly entitled to impose *some* type of sanction").

There is also no detrimental effect on this court's docket. No final pretrial conference or trial date is presently scheduled.  This court's calendar, which includes a number of upcoming trials, allows ample time to accommodate reopening of expert discovery, production of the expert report and thereafter a deposition of Collins.  As previously noted, Cunningham's need for the precluded evidence is great and Acadia can overcome the adverse effect of the late disclosure by deposing Collins.[4] Cunningham does not have a history of repeatedly missing court deadlines.  In sum, exercising this court's discretion and weighing and balancing all of the relevant concerns, the failure to provide the expert report and the identity of Collins as a testifying expert was harmless.  Accordingly, Cunningham may use

---

[3]  This court leaves the choice of sanction to further briefing and the filing by Acadia of a motion for sanctions.

[4]  The parties are instructed to confer in an attempt to arrive at an agreed upon date to provide the expert report and conduct the deposition.  This court will conduct a status conference on February 3, 2011, to discuss the dates.

the affidavit in opposition to summary judgment.

Acadia additionally moves to strike paragraphs eight through 11 of Cunningham's affidavit. Addressing the paragraphs seriatim, Acadia objects to the averment in paragraph eight that "I inspected the boat" and "determined that the boat looked fine" because it contradicts deposition testimony. The deposition testimony reads as follows:

> Q. At no time between November of '06 and you discovered the water in June of '07 did you actually go on board PERSEVERANCE?
>
> A. No.

(Docket Entry # 19, Ex. 1). Elsewhere during his deposition, Cunningham testified that:

> Q. Anything else?
>
> A. I made sure that was done properly. And I had inspected [the vessel] periodically throughout the winter.
>
> Q. How many times did you visit the vessel between November '06 and June of '07?
>
> A. It would have been me personally definitely four times, possible five.

(Docket Entry # 19, Ex. 1).

It is true that, "a party opposing summary judgment cannot create a genuine issue of material fact by the simple expedient of filing an affidavit that contradicts clear answers to unambiguous questions in an earlier deposition." Gillen v. Fallon Ambulance Service, Inc., 283 F.3d 11, 26 (1st Cir. 2002). The answers to the depositions questions, however, were not

10

contradictory but, instead, consistent with the averment that Cunningham inspected the vessel.  The fact that he did not board the vessel for the inspection does not establish a contradiction.  Paragraph eight therefore constitutes part of the summary judgment record.

Citing Rule 56(e)(1), Fed. R. Civ. P. ("Rule 56(e)"),[5] Acadia moves to strike paragraph nine[6] because the averment "is not supported by facts in this case."  (Docket Entry # 25).  The disputed testimony, however, concerns Cunningham's purchase of a custom cover for the vessel and his belief that portions of the vessel did not require a cover because of drains.  Cunningham has personal knowledge to support the averment that, "I purchased and installed a custom cover for my vessel" and that the uncovered area "was equipped with drains."  (Docket Entry # 24, ¶ 9).  The fact that the averment responds to evidence in the vessel's owner manual regarding winter storage (Docket Entry # 19, Ex. 3, pp. 6-7) and a statement in Acadia's LR. 56.1 statement (Docket Entry # 19, ¶ 10) does not provide a basis to strike the averment.  The

---

[5]  Rule 56(e) requires that an affidavit opposing summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify."  Rule 56(e), Fed. R. Civ. P.

[6]  In paragraph nine, Cunningham avers that, "I purchased and installed a custom cover for my vessel.  The portion of the vessel that was not covered by the custom cover did not need to be covered as the vessel was equipped with drains to handle the area."  (Docket Entry # 24, ¶ 9).

averment also does not contradict deposition testimony or a diagram of the vessel that depicts the covered and uncovered areas. Finally, it is not necessary to resolve whether to admit Cunningham's further testimony that the uncovered portion "did not need to be covered" because of the drains. Admission of the statement would not alter or change the decision on the summary judgment motion.

Acadia objects to the admission of paragraphs ten and 11 of Cunningham's affidavit as "unsupported by facts and personal knowledge." (Docket Entry # 25). The paragraphs respond to statements in Acadia's LR 56.1 statement that certain photographs of the damaged area "clearly show multiple water levels on the walls and wood of the Vessel." (Docket Entry # 19, ¶¶ 12-13). In these paragraphs, Cunningham attests that:

> [I]f the photographs show multiple water levels, it may have
> resulted from the boat falling from stilts or cradle, while
> at Bert's boat yard . . . Also, before the photographs were
> taken I believe the Vessel fell from its stands which could
> account for multiple water levels, if that is what the
> pictures depict.

(Docket Entry # 24, ¶¶ 10-11). Acadia contends that Cunningham lacks expert knowledge regarding when and how the water levels formed. The averment that the water levels, if any, "may have resulted" because of the vessel's fall is stricken because Cunningham does not have personal knowledge about the cause of the water levels, if any. Observing the photographs, however, and not considering Cunningham's belief that the different water

levels, if any, resulted from the vessel's fall from its stilts, it is a genuine issue of material fact whether they even show water damage at multiple levels and, if so, whether such damage occurred suddenly.[7]

## STANDARD OF REVIEW

Summary judgment is designed "'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" Davila v. Corporacion De Puerto Rico Para La Difusion Publica, 498 F.3d 9, 12 (1st Cir. 2007). It is appropriate when the summary judgment record shows "there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." American Steel Erectors, Inc. v. Local Union No. 7, International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers, 536 F.3d 68, 75 (1st Cir. 2008). "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." Id.

Facts are viewed in favor of the non-movant, i.e., Cunningham. Noonan v. Staples, Inc., 556 F.3d 20, 23 (1st Cir.

---

[7] As discussed infra, the policy covers "[s]udden and accidental, direct, physical loss of or damage to" the vessel. (Docket Entry # 19, Ex. 2).

2009). "Where, as here, the nonmovant has the burden of proof and the evidence on one or more of the critical issues in the case is not significantly probative, summary judgment may be granted." Davila, 498 F.3d at 12 (internal quotation marks, citation and ellipses omitted); accord Clifford v. Barnhart, 449 F.3d 276, 280 (1ˢᵗ Cir. 2006) (if moving party makes preliminary showing, nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue" with respect to each element on which he "would bear the burden of proof at trial") (internal quotation marks and citations omitted). The facts, viewed in Cunningham's favor, are as follows

FACTUAL BACKGROUND

In November 2003, Cunningham purchased a 2003 Mainship 400 Trawler and named it the Perseverance II. As in prior years, Cunningham insured the vessel with Acadia in 2007 under a marine insurance policy.

The policy, in effect from December 2006 to December 2007, covers "sudden and accidental" losses. The relevant provision reads as follows:

**LOSSES COVERED** – Subject to all terms, conditions and exclusions set forth elsewhere in this policy and to limitations as to the amount set forth below and on the Declaration Page, Section A, we will pay for the following which occur during the policy period:

1. Sudden and accidental, direct, physical loss of or damage to the insured property due to an external cause;

(Docket Entry # 19, Ex. 2).  The policy also covers "any latent defect in the hull or machinery."  (Docket Entry # 19, Ex. 2).

The policy excludes losses resulting from "[w]ear and tear" and "weathering."  The pertinent language is as follows:

**LOSSES NOT COVERED** – we will not pay for any loss, damage or expense caused by or resulting, whether exclusively or concurrently, from:

1. Wear and tear, gradual deterioration, weathering, bubbling, blistering, delamination of fiberglass or plywood, corrosion, rusting, electrolysis, mold, wet or dry rot, mice and rodents, marine life, insects, water- or air-borne organisms, ice or freezing, and weather related overheating.

(Docket Entry # 19, Ex. 2).

The policy voids certain coverage if the insured does not keep the insured vessel in a seaworthy condition.  The applicable language states:

<u>SEAWORTHINESS</u> – All coverage under Section A will be void if you do not maintain the yacht in a seaworthy condition at all times.  This means you must keep the yacht and its machinery and equipment well maintained and in good repair so that the yacht cannot be damaged by ordinary weather or water conditions or the rigors of normal use.

(Docket Entry # 19, Ex. 2).

In November 2006, Cunningham took the vessel out of the water and stored it outside at Bert's Boat Yard ("Bert's") in Weymouth, Massachusetts.  Bob Clancey ("Clancey") winterized the vessel and was the last person on the vessel before its winter storage.  Clancey also owned a boat and stored it that winter at

Bert's.  Clancey checked the canopy and the framework of the vessel whenever he checked his boat that winter and spring. (Docket Entry # 19, Ex. 1).

The vessel was stored eight feet off the ground on stilts or a cradle.  A custom canopy covered a portion of the helm as well as a flybridge on the upper deck up to the beginning of a stairwell.  The canopy did not cover the stern of the vessel to the rear of the stairwell, an area equipped with drains.  Water could therefore fall to the stern of the canopy and onto the upper and lower deck.  (Docket Entry # 19, Ex. 1 & 4).

The vessel has bilge pumps and one bilge plug half an inch in diameter.  Before storing the vessel, Cunningham did not pull the bilge plug.  He also did not perform mechanical work on the vessel prior to the winter storage.  (Docket Entry # 19, Ex. 1).

The manual, which came with the vessel and which Cunningham "did go through," contains the following instructions:

WINTERIZATION AND STORAGE

Indoor storage is beneficial if you are storing your yacht in a climate that produces ice and snow . . . If you use outdoor storage facilities, cover your yacht with a canvas cover with provisions for ventilation to keep the yacht from "sweating."  Building a frame over the boat to support the canvas will allow the passage of air around the yacht . . ..

DRAINING YOUR YACHT

Your yacht has drain plugs for draining water from the bilges.  Some compartments in the bilge may not drain completely because of the position of the yacht.  Pump these compartments out then use a sponge to remove all remaining water.

Procedures for draining and winterizing the fresh water
system are in this section under "Preparing for Storage"
heading . . ..

PREPARING FOR STORAGE . . .

5.  Prepare holding tank:
a.  Empty and rinse holding tank until tank is clean.
b.  Close head intake seacock and remove hose . . .
e.  Remove drain plug from seacock while valve is closed.
Allow line to drain.  Replace drain plug.

SUPPORTING YOUR YACHT DURING STORAGE . . .

6.  In areas where temperatures fall below freezing, the
bilge area under the engines must be pumped out and sponged
completely dry.  Check areas that do not drain to the pumps.
Drain mufflers . . .

8.  Remove seacock drain plugs to prevent damage from
freezing.  Close all seacocks.

(Docket Entry # 19, Ex. 1 & 3).

As noted above, Clancey winterized the vessel.  It is also
reasonable to infer that he drained the bilge area in performing
the winterization.[8]  (Docket Entry # 19, Ex. 1).

Cunningham visited the boat yard and visually inspected the
vessel four or five times during the November 2006 to June 2007
storage.  He did not physically board the vessel or look inside
the bilge.  He observed the canopy and the telescoping legs which
remained in place thereby allowing water to run off the canopy.
Cunningham's last visit took place in late April or early May.
The vessel appeared fine during all of the inspections.  (Docket

_____

    [8]  On summary judgment, reasonable inferences are drawn in
favor of the non-movant, Cunningham.

Entry # 24).

Cunningham next visited the vessel on June 17, 2007. At that point, he discovered water accumulated in the vessel. Specifically, he saw water had entirely filled the bilge area and flooded the lower cabin area. The water damaged the carpet in the forward cabin, stateroom and passage way. The water damage also necessitated replacement of a hot water heater and other equipment. The estimated cost is $86,823.46. (Docket Entry # 19, ¶ 11; Docket Entry # 21, ¶ 11; Docket Entry # 19, Ex. 1; Docket Entry # 24).

Cunningham filed an insurance claim and Acadia denied coverage. Cunningham thereafter "retained the professional services" of Collins who inspected the boat as previously described. Collins concluded that the cause of the damage was the disconnect between the hose and its nipple. He also opined that the damage when the hose disconnected was "sudden" inasmuch as he avers that the single bilge plug would not "extract the sudden burst of water that poured" into the vessel when the "hose disconnected from its nipple."


<u>DISCUSSION</u>

Acadia moves for summary judgment on the basis that the loss was not "sudden and accidental" and does not fall within the reach of coverage. Acadia additionally argues that the "wear and

tear" provision excludes coverage for the loss. Finally, Acadia argues that Cunningham did not properly maintain the vessel in a "seaworthy" condition thereby voiding coverage.

Notably, the insurance policy has a clause, overlooked by the parties, that dictates the application of general maritime law.[9] Federal maritime law therefore applies to the policy. <u>See</u> <u>Littlefield v. Acadia Ins. Co.</u>, 392 F.3d 1, 6 (1st Cir. 2004) (noting, in context of yacht policy with identical choice of law clause, that "federal maritime law is clearly applicable to the yacht policy"). Nevertheless, "general principles of contract law are used to interpret marine insurance policies." <u>Littlefield v. Acadia Ins. Co.</u>, 392 F.3d 1, 6 (1st Cir. 2004). Here, as in <u>Littlefield</u>, state law applies. First, a federal statute does not govern the present dispute. Second, there is no "specific, federal, judicially-created rule governing the interpretation of this policy." <u>Id.</u> Third, this court declines to fashion such a rule. <u>See</u> <u>Id.</u> at 7 (discerning "there is no federal statute or federal rule governing the interpretation of the policy in this case, we lastly must inquire whether we should

_____

[9] The clause states:

APPLICABLE LAW - This policy shall be governed by and construed under the general Maritime Law of the United States of America irregardless of the venue or jurisdiction of the court or arbitration.

(Docket Entry # 19, Ex. 2).

19

fashion such a rule, and conclude we should not"); see e.g.,
Royal Ins. Co. of America v. KSI Trading Corp., 563 F.3d 68, 73
(3rd Cir. 2009) (finding no controlling federal statute or
established maritime rule that applied to marine cargo insurance
policy in context of damage incurred on land in warehouse storage
facility).

Acadia submits that Massachusetts law applies. (Docket
Entry # 19, p. 4). Cunningham similarly relies on Massachusetts
state court cases except for discussing and distinguishing an
unpublished Florida case cited by Acadia and attached to its
memorandum, Great Lakes Reinsurance (UK) PLC v. Soveral, 2007 WL
646981 * (S.D.Fla. Feb. 27, 2007). The incident took place in
Massachusetts, the location of the stored vessel, and Cunningham
is a Massachusetts resident. In sum, Massachusetts law thus
applies.

Massachusetts courts utilize general rules of contract
interpretation to construe an insurance policy. Brazas Sporting
Arms, Inc. v. American Empire Surplus Lines Ins. Co., 220 F.3d 1,
4 (1st Cir. 2000) ("[u]nder Massachusetts law, we construe an
insurance policy under the general rules of contract
interpretation"). A policy's actual language is "given its plain
and ordinary meaning" considering "'what an objectively
reasonable insured, reading the relevant policy language, would
expect to be covered.'" Id.; accord National Union Fire Ins. Co.

20

Of Pittsburgh, PA v. West Lake Academy, 548 F.3d 8, 13 (1st Cir. 2008) (courts "'begin with the actual language of the policies, given its plain and ordinary meaning'" and "'[i]n so doing, we consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered'") (quoting Brazas, 220 F.3d at 4); see also Scottsdale Ins. Co. v. Torres, 561 F.3d 74, 77 (1st Cir. 2009) (court "'construe[s] the words of the policy according to the fair meaning of the language used, as applied to the subject matter'").[10]

In the event words of a policy "are not ambiguous, 'they must be construed in their usual and ordinary sense.'" Scottsdale Ins. Co. v. Torres, 561 F.3d at 77; accord Nascimento v. Preferred Mut. Ins. Co., 513 F.3d 273, 276 (1st Cir. 2008) (absent ambiguity, words of insurance policy are construed "in their usual and ordinary sense"). An "[a]mbiguity exists when the policy language is susceptible to more than one meaning."

_____

[10]    In construing "sudden and accidental" where the "subject matter" is release of contaminants in a pollution exclusion clause, Massachusetts courts uniformly interpret "sudden" as having a temporal requirement.  Lumbermens Mut. Cas. v. Belleville Ind., 555 N.E.2d 568, 572 (Mass. 1990) ("[w]e hold, therefore, that when used in describing a release of pollutants, 'sudden' in conjunction with 'accidental' has a temporal element").  The case of C.L. Hauthaway & Sons Corp. v. American Motorists Ins. Co., 712 F.Supp. 265, 268-269 (D.Mass. 1989), cited by the parties, also involves a pollution exclusion clause. Thus, while considered by this court, these cases are not precisely on point because the sudden and accidental language is applied to a different subject matter.

Scottsdale Ins. Co. v. Torres, 561 F.3d at 77; Genuine Bukuras v. Mueller Group, LLC, 592 F.3d 255, 262 (1st Cir. 2010) ("ambiguity requires language susceptible of more than one meaning so that reasonably intelligent persons would differ as to which meaning is the proper one"). Conversely, an ambiguity does not arise "simply because the parties offer different interpretations of the policy language." Scottsdale Ins. Co. v. Torres, 561 F.3d at 77.

The insured bears "the initial burden of proving that a loss falls within the policy's description of covered risks." New Fed Mortg. Corp. v. National Union Fire Ins. Co. of Pittsburgh, PA, 543 F.3d at 11. "It is the insurer's burden to show the applicability of a particular exclusion." Id.; accord Scottsdale Ins. Co. v. Torres, 561 F.3d at 78 ("insurer has the burden of proving that an exclusion applies").

With these principles in mind, this court turns to the interpretation of the policy's "sudden and accidental" language as applied to the subject matter. To avoid a construction that renders language superfluous, sudden as well as accidental should each have meaning. See generally Lumbermens Mut. Cas. v. Belleville Ind., 555 N.E.2d at 572; Leitzes v. Provident Life and Acc. Ins. Co., 379 F.Supp.2d 15, 18 (D.Mass. 2005) (no word in disability policy "should be treated as surplusage if any other construction is rationally possible"); Middlesex Mut. Assur. Co.

v. Fish, 2010 WL 3342207, *12 (D.Me. Aug. 24, 2010) ("'rented or loaned'" language demonstrates that "'[l]oaned' must have an independent meaning from 'rented' or it would be mere 'surplusage'").

Accidental means at a minimum unexpected and unforeseen. See New England Gas & Elec. Ass'n v. Ocean Acc. & Guarantee Corp., 116 N.E.2d 671, 679-680 (Mass. 1953); see also Lumbermens Mut. Cas. v. Belleville Ind., 555 N.E.2d at 572 (discussing New England Gas, 116 N.E.2d at 679-680). Explaining the phrase "sudden and accidental" in a machinery and boiler policy, the court in New England Gas explained that, "The term accident, unlimited except by the word sudden, should be given its ordinary meaning as denoting an unexpected, undesigned, and unintended happening or a mishap and as including an event which, according to the common understanding of people in general, would rightly be considered as accident." New England Gas & Elec. Ass'n v. Ocean Acc. & Guarantee Corp., 116 N.E.2d at 679-680.

In order to avoid rendering "sudden" surplus language, the term used in conjunction with "accidental" should import a temporal meaning. See Lumbermens Mut. Cas. v. Belleville Ind., 555 N.E.2d at 572 (construing "sudden" in "sudden and accidental" phrase, albeit in a pollution exclusion within comprehensive

23

general liability policy, as having "temporal element"). A temporal meaning for the term sudden thus implicates a loss or damage to the vessel that is not gradual. See <u>Lumbermens Mut. Cas. v. Belleville Ind.</u>, 555 N.E.2d at 572 (distinguishing sudden from not gradual albeit in context of pollution exclusion in a different type of insurance policy).

The policy affords coverage for a "sudden and accidental" loss or damage to the vessel. The evidence shows that water infiltrated the vessel and caused the loss or damage. (Docket Entry # 19, ¶ 1; Docket Entry # 21, ¶ 1; Docket Entry # 24, ¶ 7). The issue therefore devolves into whether the infiltration of water into the vessel while stored at the boat yard was "sudden and accidental." Collins' averment that the "sudden burst of water" that poured into the vessel through the disconnected hose (Docket Entry # 23) provides sufficient evidence to withstand summary judgment that the event was sudden and not gradual. It is also a genuine issue of material fact as to whether the photographs depict different levels of water damage and at what point in time such damage was incurred.

A jury could also find that the loss or damage was unexpected and unforeseen. The disconnection of the hose was hidden and out of view. The unforeseen and unexpected nature of

the loss or damage is further evidenced by the initial inability of Acadia's investigator to find the disconnection hidden behind the wall.

Acadia also argues that the loss resulted from wear and tear, gradual deterioration, weathering, wet rot, ice and/or freezing which the policy excludes in the losses not covered section. Acadia submits that the water accumulated over a period of months and the photographs depict the multiple levels of water.

Contrary to Acadia's position, the photographs do not undisputedly show multiple water levels and there are genuine issues of material fact as to whether and when the water levels and marks, if any, arose. Collins opines and a jury could find that the "disconnect between the hose and its nipple was the sole reason that water entered and damaged the vessel." (Docket Entry # 23). This opinion allows a jury to dispel and discount a finding that the water damage was concurrently or exclusively caused by or resulted from weather, wear and tear, ice, freezing, gradual deterioration and/or wet rot.

Acadia next maintains that Cunningham's failure to keep the vessel in a seaworthy condition voids coverage of the water damage. Briefly stated, the policy defines a "seaworthy

condition" as keeping the yacht and the equipment in good repair "so that the yacht cannot be damaged by ordinary weather." (Docket Entry # 19, Ex. 2). The plain and ordinary meaning of the language "so that" suggests a causal connection. Viewing the evidence in Cunningham's favor, Clancey properly winterized the vessel. The canopy covered the flybridge to the beginning of the stairwell and the uncovered area was equipped with drains. The hidden hose disconnected suddenly from the nipple causing the water damage and loss. Thus, a reasonable jury could find that Cunningham properly maintained the vessel's equipment and kept the equipment in good repair "so that" the yacht could not be damaged by water conditions and that it was the hose, fully hidden from view, that suddenly disconnected and solely caused the water to pour into the vessel such that it incurred the water damage.

As a final matter, <u>Great Lakes</u>, the Florida case relied on by Acadia, is distinguishable for a number of reasons. First, the case involves accumulated rainwater in a boat because the bilge pump was not able to operate due to dead batteries. <u>Great Lakes Reinsurance (UK) PLC v. Soveral</u>, 2007 WL 646981 *1 (S.D.Fla. Feb. 27, 2007). The evidence in this case, however, supports a jury finding that the water entered suddenly. Even if

Cunningham did not remove the bilge plug, Collins opines that the single bilge plug would not "extract the sudden burst of water that poured into" the vessel.  (Docket Entry # 23).  Viewing the record in Cunningham's favor, a jury could find that the bilge plug is not at issue or a cause of the loss.  In addition, unlike the corrosion of the batteries in <u>Great Lakes</u>, 2007 WL 646981 *3 (finding that "deterioration of a battery constitutes normal wear and tear and is not fortuitous"), a jury could find that the disconnection of the hose from its nipple was not the result of wear and tear similar to the corrosion of a battery.


<u>CONCLUSION</u>

Accordingly, the summary judgment motion (Docket Entry # 19) is **DENIED**.  The parties shall appear at a status conference at 2:30 p.m. on February 3, 2011, to address the deadline for Cunningham to file an expert report and the date for Collins' deposition.  Acadia may move for sanctions.


    /s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge